UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re:

HOSTESS BRANDS, INC., et al.,[1]

                Debtors.
------------------------------------------------------------x

BAKERY, CONFECTIONERY, TOBACCO
WORKERS AND GRAIN MILLERS
INTERNATIONAL UNION,

                Appellant,

       -against-

HOSTESS BRANDS, INC., et al.,

                Appellees.
------------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC# _____
DATE FILED: 9/27/13

**OPINION AND ORDER**

12 Civ. 5708 (ER)

Ramos, D.J.:

      The Bakery, Confectionery, Tobacco Workers and Grain Millers International Union, on behalf of its thirty-five local unions who are the "authorized local representatives" of certain of the Debtors' employees and retirees (collectively, "BCT" or "Appellant"), appeals the Order of the Bankruptcy Court denying its motion for administrative expense treatment of certain payments allegedly owed by the Debtors (collectively, "Hostess" or "Appellees"). Doc. 1. The sole issue raised on appeal is whether Hostess remains contractually obligated to make post-petition pension contributions (the "Pension Wage Deferrals") to a multiemployer pension fund (the "Fund" or the "B&C Fund") on behalf of employees represented by Appellant. For the reasons set forth below, the order of the Bankruptcy Court is AFFIRMED.

---

[1] The Debtors are the following six entities: Hostess Brands, Inc., IBC Sales Corporation, IBC Services, LLC, IBC Trucking, LLC, Interstate Brands Corporation and MCF Legacy, Inc.

I.   **Background**

The following facts are not disputed unless otherwise noted.

Hostess currently has 117 collective bargaining agreements with local affiliates of BCT (the "CBAs"), which govern employees' wages, benefits, and working conditions. Appellant's Br. at 3, Doc. 5. Prior to December 2011, Hostess served as a participating employer in the Bakery and Confectionery Union and International Health Benefits and Pension Fund (the "B&C Fund" or the "Fund"), a multiemployer pension fund that covers BCT members, including Hostess employees and retirees. *Id.* at 4; Appellees' Br. at 1, Doc. 6. The B&C Fund Agreement and Declaration of Trust (the "Trust Agreement"), which is specifically incorporated into the CBAs, governs the relationship between Hostess and the B&C Fund. Appellant's Br. at 4-5; Decl. of Frank Hurt in Support of BCT Admin. Expense Mot. ("Hurt Decl."), Ex. A (representative CBA at Art. XII: Pension), Bankr. Doc. 863-2 (the CBAs state that "[t]he Employer hereby agrees to be bound as a party by all the terms and provisions of the [Trust Agreement] … and said [Trust] Agreement is made part hereof by reference.").

A subsection of one article within each CBA pertains specifically to pensions. The vast majority of the CBAs (111 of 117) require Hostess to make payments to the B&C Fund on behalf of represented employees. Appellant's Br. at 3-4; Appellees' Br. at 4 n.3 (citing Mem. of Law of B&C Fund in Support of BCT Admin. Expense Mot., Bankr. Doc. 1123). The B&C Fund is the sole mechanism specified by the CBAs through which covered employees may receive pension contributions. *See, e.g.*, Hurt Decl., Ex. A (representative CBA at Art. XII: Pension) ("The Employer agrees to make payments to the [B&C] Fund for each employee working in job classifications covered by the said [CBA] …"). In addition, the pension-related clauses within the CBAs include language specifying that "[t]his clause encompasses the sole

2

and total agreement between the Employer and the Union with respect to pensions or retirement."[2] *Id.*

Under the Trust Agreement, only the employees "of a contributing employer" have a right to accrue benefits, and the trustees of the B&C Fund have the authority to terminate an employer's participation in the B&C Fund. Appellees' Br. at 7, Appendix A (Trust Agreement at Art. VI § 2; Art. XII § 1). "All contributions shall be made effective as required by the [CBA] and shall continue to be paid as long as the Employer is so obligated pursuant to the [CBA] or until he ceases to be an Employer within the meaning of this Agreement." *Id.* (Trust Agreement at Art. V § 2). The Trust Agreement specifically provides that "[a]n Employer shall cease to be an Employer within the meaning of [the Trust Agreement] when he is no longer obligated, pursuant to a [CBA], to make contributions to the Pension Fund, or, as determined by the Trustees, when [the Employer] is delinquent in his contributions or reports to the Pension Fund." *Id.* (Trust Agreement at Art. XII § 1). The Trust Agreement also contains a provision stating that covered employees have no "right, title or interest in or to the Fund or any property of the Fund … except as may be specifically determined by the Trustees." *Id.* (Trust Agreement at Art. XII § 2).

In August 2011, due to financial difficulties, Hostess became unable to make their contribution payments to the B&C Fund and thirty-nine other multiemployer pension funds in which it had been participating. Appellees' Br. at 7; Appellant's Br. at 4. On November 10, 2011, the B&C Fund informed Hostess that on December 10, 2011, it would become delinquent in its contribution payments in excess of 120 days, and that, "once an employer's account

---

[2] As discussed *infra*, all of the CBAs at issue include "sole and total agreement" language except for the following three: BCT Local 37, Henderson Bake Shop CBA (Appendix C to Appellees' Br.); BCT Local 503, Fayetteville and Lumberton Route Sales Representatives and Thrift Stores CBA (Appendix D to Appellees' Br.); and BCT Local 372B, Indianapolis Bakery Outlet CBA (Appendix E to Appellees' Br.). *See also* Hr'g Tr. 87:19 – 87:22, Jun. 19, 2012.

becomes delinquent to the Fund for 120 days or more," the B&C Fund's policy is to terminate that employer's participation. Appellees' Br. at 8, Appendix H (Nov. 10, 2011 Letter). At that time, the B&C Fund "made clear that upon the Debtors' termination, the Debtors' employees would no longer accrue benefits under the B&C Fund." *Id.*

On December 15, 2011, the B&C Fund notified Hostess that "[e]ffective December 10, 2011, your participation in the [B&C] Fund was terminated due to your failure to contribute to the fund for 120 days or more," and "the Trustees [have] the power to terminate in the event of continued delinquency." *Id.* at 8, Appendix J (Dec. 15, 2011 Termination Letter). In addition, the B&C Fund assessed $919,806,165 of withdrawal liability against Hostess due to its total withdrawal. *Id.* at 8, Appendix I (Dec. 12, 2011 Demand for Withdrawal Liability).

On January 11, 2012, Hostess filed for Chapter 11 bankruptcy protection. Voluntary Petition, Bankr. Doc. 1. As of January 11, 2012, approximately 7,000 of Hostess's 19,000 employees were represented by BCT. Appellees' Br. at 4. Pursuant to the Bankruptcy Code, the Debtors were authorized to continue to operate their business and manage their properties as debtors in possession. *Id.* Subsequent to the initiation of the Chapter 11 bankruptcy proceeding, employees represented by BCT continued to work for Hostess. Appellant's Br. at 4. Appellant claims that, pursuant to the CBAs, as of May 9, 2012, Hostess owed its unionized employees approximately $14,000,000 in Pension Wage Deferrals that accrued after January 11, 2012.[3] *Id.* at 5.

---

[3] Appellant claims that Hostess now owes more, as contribution dues have continued to accrue since May 2012, but does not specify another amount. Appellant's Br. at 5.

On May 4, 2012, the Bankruptcy Court granted Hostess's motion to (a) reject certain CBAs and (b) modify certain retiree benefit obligations pursuant to Sections 1113(c) and 1114(g) of the Bankruptcy Code. *See* Bankr. Doc. 848. According to Appellant, as of May 9, 2012, Hostess had not implemented the terms of the section 1113/1114 proposal authorized by the Bankruptcy Court, and therefore Hostess continued to have an obligation to pay post-petition wages and benefits to covered employees as they became due under the CBAs. *See* Appellant's Br. at 5 n.2; BCT Admin. Expense Mot. ¶¶ 9-10, Bankr. Doc. 863.

Based on the theory that the CBAs required payment of the post-petition Pension Wage Deferrals despite termination of Hostess from the B&C Fund, on May 9, 2012 Appellant filed a motion for an order seeking administrative expense treatment of the Pension Wage Deferrals and compelling Hostess to make immediate payments.[4]  *See* BCT Admin. Expense Mot. ("Appellant's Administrative Expense Motion"), Bankr. Doc. 863.  Between April 2, 2012 and May 11, 2012, nine additional multiemployer pension funds in which Hostess had been participating (the "Other Funds"), not including the B&C Fund, filed similar motions seeking administrative expense treatment of unpaid post-petition contributions from Hostess (the "Other Funds' Motions").  *See, e.g.*, Bankr. Docs. 595, 596, 682, 737, 774, 786, 788, 841, 860; Appellant's Br. at 5.  Whereas the B&C Fund terminated Hostess's participation in December 2011, none of the Other Funds elected to terminate Hostess's participation despite Hostess's failure to make contributions to them since August 2011.[5]  Appellees' Br. at 9.

The Honorable Judge Drain presided over hearings on Appellant's Administrative Expense Motion and the Other Funds' Motions on May 30, 2012 and June 19, 2012.  At the June 19, 2012 hearing, Judge Drain determined that the post-petition Pension Wage Deferrals that Hostess owed to the Other Funds should receive administrative expense priority.  However, Judge Drain denied Appellant's Administrative Expense Motion, finding that, per the terms of the Trust Agreement, upon Hostess's expulsion from the B&C Fund in December 2011, Hostess

---

[4] Below, Appellant argued that its claim for unpaid, post-petition contributions is entitled to an administrative expense priority under Section 503(b) of the Bankruptcy Code and that it is also entitled to current payment of post-petition contributions under Section 1113(f) of the Bankruptcy Code, which provides that a debtor shall not unilaterally terminate a CBA.  Hr'g Tr. 79:12 – 79:19.  Because Section 1113(f) does not address the priority to be accorded claims arising from debtors' obligations under a CBA, the Bankruptcy Court focused "solely upon whether the claim is entitled to [administrative expense] priority under Section 503(b)." Hr'g Tr. 80:1 – 80:14.

[5] One additional fund (the "Local 550 Fund") terminated Hostess, and filed a motion seeking administrative expenses, Bankr. Doc. 1186, but only sought administrative claims for contributions due after the petition date and *prior to termination* from the fund.  *See* Appellees' Br. at 9 n.7 (citing Bankr. Doc. 1186 at 14 n.2).

5

ceased to be an "employer" as defined in the Trust Agreement, and was no longer required to contribute to the fund except on a withdrawal basis. Hr'g Tr. 86:6 – 86:21. Thus, any claim would be for pre-petition withdrawal liability, not post-petition administrative expenses. *Id.* In addition, the Bankruptcy Court found that: (1) even if certain CBAs required Hostess to continue to make contributions on behalf of its represented employees after December 2011, the trustees' decision to terminate Hostess's participation in the B&C Fund made it impossible for Hostess to perform; and (2) the relief sought might not be feasible because the B&C Fund's pre-petition actions precluded automatic reinstatement of Hostess in the B&C Fund, and it is unclear that reinstatement "could be done unilaterally over the automatic stay of Section 362 of the bankruptcy code in that such a unilateral act would, in fact, elevate … a withdrawal claim … into a hundred cent post-petition claim." Hr'g Tr. 77:3 – 89:18.

The Bankruptcy Court entered its order denying Appellant's motion on June 27, 2012. Bankr. Doc. 1168. Appellant timely filed a notice of appeal on June 28, 2012. Bankr. Doc. 1181.

## II. Discussion

### A. Standard of Review

This Court has jurisdiction to hear appeals from decisions of a bankruptcy court pursuant to 28 U.S.C. § 158(a), which provides in relevant part that "[t]he district courts of the United States shall have jurisdiction to hear appeals . . . from final judgments, orders, and decrees; . . . [and,] with leave of court, from other interlocutory orders and decrees . . . of bankruptcy judges." 28 U.S.C. § 158(a). A district court reviews a bankruptcy court's findings of fact for clear error and its conclusions of law *de novo. Overbaugh v. Household Bank, N.A. (In re Overbaugh)*, 559 F.3d 125, 129 (2d Cir. 2009); *see* Fed. R. Bankr. P. 8013 (a district court may "affirm, modify, or

reverse a bankruptcy judge's judgment, order, or decree," and "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous").

The sole issue raised on appeal by the BCT Union is whether the Bankruptcy Court erred in concluding that Hostess does not remain contractually obligated to make post-petition Pension Wage Deferral Payments to the B&C Fund on behalf of its BCT-represented employees. Although "[t]he interpretation of a contract is generally a question of law and subject to ... *de novo* review," *Network Pub. Corp. v. Shapiro*, 895 F.2d 97, 99 (2d Cir. 1990), this general proposition applies only when the language of the contract is unambiguous. *Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017, 1019 (2d Cir. 1985). "When the language of the contract is susceptible to more than one reasonable interpretation, the interpretation of the contract is an issue of fact." *In re Brunswick Hosp. Ctr., Inc.*, 156 B.R. 896, 899-900 (E.D.N.Y. 1993) (citation omitted).

### B. The Bankruptcy Court Properly Denied the Administrative Expense Motion

The case law governing the grant of an administrative expense is well-established in the Second Circuit. Section 507 of the Bankruptcy Code gives first priority to "administrative expenses allowed under [11 U.S.C.] section 503(b)," defined as including "the actual, necessary costs and expenses of preserving the estate, including wages, salaries or commissions for services rendered after the commencement of the case." 11 U.S.C. § 503(b)(1)(A). "[A]n expense is administrative only if it arises out of a transaction between the creditor and the bankrupt's trustee or debtor in possession, and only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business." *Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 101 (2d Cir. 1986) (citations and quotations omitted). "A debt is not entitled

7

to priority simply because the right to payment arises after the debtor-in-possession has begun managing the estate;" rather, there must be a post-petition transaction between the claimant and the debtor-in-possession and the consideration supporting the right to payment must have been both supplied to and beneficial to the debtor-in-possession in the operation of its business post-petition.  *Id.*  "Because the presumption in bankruptcy cases is that the debtor's limited resources will be equally distributed among his creditors, statutory priorities are narrowly construed."  *Id.* at 100; *see also In re A.C.E. Elevator Co., Inc.*, 347 B.R. 473 (Bankr. S.D.N.Y. 2006); *In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*, 160 B.R. 882, 889-90 (Bankr. S.D.N.Y. 1993); *In re Drexel Burnham Lambert Group Inc.*, 134 B.R. 482, 488 (Bankr. S.D.N.Y. 1991).  "The burden of proving entitlement to priority payment as an administrative expense ... rests with the party requesting it."  *In re Bethlehem Steel Corp.*, 479 F.3d 167, 172 (2d Cir. 2007) (citations omitted).

The Multiemployer Pension Plan Amendments Act ("MPPAA") provides that, if an employer withdraws from a multiemployer plan, he is liable in an amount to be determined under 29 U.S.C. § 1391 for "withdrawal liability."  29 U.S.C. § 1381(a).  "Withdrawal liability" describes an employer's obligation, upon his withdrawing from a multiemployer plan requiring him to make periodic payments toward employees' insurance and pensions, to make a lump sum payment of additional money to the fund.  *McFarlin's, Inc.*, 789 F.2d at 99.  "This payment is required to satisfy the employer's pro rata share of the vested but unfunded benefits to be paid to employees participating in the plan, including those employed by others."  *Id.*  In the context of bankruptcy priorities, withdrawal liability may be considered an administrative expense, but "only if it arises out of a transaction between the creditor and the … debtor in possession and only to the extent that the consideration supporting the claimant's right to payment was both

supplied to and beneficial to the debtor-in-possession in the operation of the business." *In re Klein Sleep Products, Inc.*, 78 F.3d 18, 24-25 (2d Cir. 1996) (citing *McFarlin's*, 789 F.2d at 101) (quotations omitted). Otherwise, "withdrawal liability" will be deemed a general unsecured claim. 789 F.2d at 99-104.

### i. Effect of Hostess's Termination from the B&C Fund

The Bankruptcy Court correctly concluded that Appellant's claim for post-petition Pension Wage Deferrals is not entitled to administrative expense treatment because Hostess's obligation and ability to contribute to the B&C Fund ended *pre-petition* in December 2011, upon the B&C Fund trustees' termination of Hostess's status as an "employer" in the fund.

Appellant claims that the Bankruptcy Court "ignored general principles regarding the limited rights of third party beneficiaries" and thus erred in concluding that the actions of the B&C Fund, "a mere third-party beneficiary" to the CBAs, could extinguish the rights and obligations of the parties to the CBAs. Appellant's Br. at 7-8. Appellant also argues that the Bankruptcy Court discounted the body of federal case law holding that the trustees of multiemployer pension plans cannot alter the obligations of the parties to a CBA. *Id.* at 8 (citing, *e.g.*, *N.L.R.B. v. Amax Coal Co., a Dic. Of Amax, Inc.*, 453 U.S. 322, 336 (1981)). In addition, Appellant argues that the language of the Trust Agreement does not support the Bankruptcy Court's finding. According to Appellant, "when the Trustees terminated Hostess for delinquency under the Trust Agreement, their action was wholly unrelated to Hostess' continuing obligations to its employees under the CBA," and that "[a]lthough the CBAs incorporate the Trust Agreement, they are not subsumed by it." *Id.* at 15. Appellant thus claims that Hostess's obligations to contribute to the B&C Fund pursuant to the CBAs survived the B&C Fund's

9

decision to eject Hostess from the B&C Fund.  Appellant has failed to provide a reason to disturb the Bankruptcy Court's findings.

The right to contribution by Hostess to the B&C Fund is established in provisions of the CBAs dealing with pension obligations.  Hr'g Tr. 79:1 – 79:11.  The CBAs require Hostess to make contributions to the B&C Fund, and the B&C Fund is the *exclusive* avenue through which the CBAs provide for contribution payments.  The vast majority[6] of the CBAs include language indicating that the clause in the CBA dedicated to pension benefits—again, which only provides for contributions *to the B&C Fund*—"encompasses the sole and total agreement between the Employer and the Union with respect to pensions or retirement."  Hurt Decl. ¶ 5, Ex. A (sample representative CBA at Art. XII:  Pension).  In addition, the CBAs expressly incorporate the Trust Agreement, which grants the trustees discretion to terminate an employer:  "[a]n Employer shall cease to be an Employer within the meaning of [the Trust Agreement]…*as determined by the trustees*," when the employer is delinquent in contributions.  Appellees' Br. at 7, Appendix A (Trust Agreement) (emphasis added).

The plain meaning of the language in a CBA determines an employer's obligation to a multiemployer fund.  *See Bakery and Confectionery Union and Indus. Int'l Pension Fund v. Ralph's Grocery Co.*, 118 F.3d 1018, 1021 (4th Cir. 1997); *see also H&M Hennes & Mauritz LP v. Skanska USA Bldg., Inc.*, 617 F. Supp. 2d 152, 156 (E.D.N.Y. 2008) ("Under New York law, the intent of the parties expressed in a written contract governs, and the intent must be ascertained from the plain meaning of the language employed.").  Based on the plain meaning of the language in the contracts at issue, the Bankruptcy Court correctly held that, for almost all relevant CBAs, "the employer's agreement to make payments to the pension fund pursuant to the [Trust Agreement] encompasses the sole and total agreement between the parties with respect to

---

[6] All but three.  *See* note 2, *supra*.

the pension obligation under the CBA," and thus, the provisions of the Trust Agreement terminating Hostess's pension obligations govern, per the "express terms of the CBA." Hr'g Tr. 87:3 – 87:16. The context here is not that of a pension fund trustee trying to intervene in the collective bargaining process or improperly modify contribution payment rates, as in *United Food & Commercial Workers v. Super Fresh Food Mkts. Inc.*, No. 04 Civ. 1266 (RMB), 2008 WL 3874304 (D.N.J. Aug. 19, 2008), cited by Appellant. Rather, the outcome of collective bargaining process between Hostess and BCT was that the parties chose to adopt CBAs that: (1) provided only one avenue for Hostess to make contributions—the B&C Fund; and (2) incorporated the Trust Agreement, which explicitly granted the trustees of the B&C Fund the power to expel Hostess from the B&C Fund. While it is true, as Appellant notes, that only the parties to the CBAs—Hostess and the unions—have the power to modify or rescind the CBAs, the B&C Fund trustees acted in a manner specifically approved by the CBAs and the Trust Agreement, and did not exceed the contractual bounds of their authority.

As the Bankruptcy Court noted, it is undisputed that, because Hostess remained delinquent on their pension benefit contributions for over 120 days, pursuant to its policy, the B&C Fund terminated Hostess from the B&C Fund, effective December 10, 2011. Accordingly, on December 10, 2011, pursuant to the terms of the Trust Agreement, Hostess ceased to be an "employer" as defined in the Trust Agreement. It is also undisputed that since December 10, 2011, the B&C Fund has not credited covered employees for the pension credits they have earned. Hr'g Tr. 85:23 – 86:5. Likewise, the B&C Fund's right to receive contributions from Hostess ended in December 2011. Appellant argues that Hostess is not excused from its obligation to pay pension wage deferrals under the CBAs due to the disjunctive nature of the termination clause in the Trust Agreement, but this argument also fails. Again, based upon the

11

plain language of the CBAs, which obligates the employer to make payments *to the B&C Fund*, rather than simply obligating the employer to "make payments," read in conjunction with the Trust Agreement, it is clear that an obligation to contribute to the B&C Fund cannot survive the Fund's decision to terminate the Employer.

Moreover, upon termination from the B&C Fund, Hostess was assessed withdrawal liability. As such, after December 10, 2011, Hostess was no longer required to contribute to the Fund except for on a withdrawal basis. Hr'g Tr. 86:6 – 86:13 (citing Trust Agreement, Art. V § 2, Art. XII, § 1). Hr'g Tr. 86:14 – 86:21. Here, as in *McFarlin's*, the consideration supporting withdrawal liability was *pre-petition* labor. 789 F.2d at 100. Appellant's proper claim, per *McFarlin's*, would not be for administrative expenses, but rather, for withdrawal liability—which is not entitled to administrative expense priority. Hr'g Tr. 86:14 – 86:21; *Matter of Cott Corp.*, 47 B.R. 487 (Bankr. D. Conn. 1984) (pre-petition amount of "withdrawal liability" imposed on debtor by ERISA was a general, unsecured claim). Thus, the Bankruptcy Court correctly found that Hostess's withdrawal liability does not receive administrative expense priority. Hr'g Tr. 87:3 – 87:16.

### ii. The Doctrine of Impossibility

Three of the CBAs[7] lack the provision—included in the more than 100 other CBAs—specifying that a specific CBA article or clause concerning pension benefits constitutes the "sole and total agreement between the parties." With respect to this small subset of CBAs, Judge Drain found that those agreements nonetheless "provide for an obligation to make the pension contribution to the pension fund and that contribution is, at this point, precluded by the actions of the pension fund." Hr'g Tr. 87:17 – 88:1. By the plain terms of those agreements, reasoned

---

[7] BCT Local 37, Henderson Bake Shop CBA (Appendix C to Appellees' Br.); BCT Local 503, Fayetteville and Lumberton Route Sales Representatives and Thrift Stores CBA (Appendix D to Appellees' Br.); and BCT Local 372B, Indianapolis Bakery Outlet CBA (Appendix E to Appellees' Br.). *See also* Hr'g Tr. 87:19 – 87:24.

Judge Drain, Hostess cannot make the required payments because the trustees of the B&C Fund's decision to terminate Hostess eliminated the only avenue through which Hostess might make such payments.  Specifically, the Bankruptcy Court held that "[c]onsistent with the directive to construe administrative expenses narrowly and [the Bankruptcy Court's] belief that the B&C Fund was not compelled to terminate the Debtors' participation, but chose to do so," the doctrine of impossibility applies here.  Hr'g Tr. 88:12 – 88:24.

The doctrine of impossibility excuses a party's contractual duty to perform when unforeseeable, supervening circumstances render performance impossible.  *See, e.g.*, *United States v. Gen. Douglas MacArthur Senior Vill., Inc.*, 508 F.2d 377, 381 (2d Cir. 1974) ("In general impossibility may be equated with an inability to perform as promised due to intervening events, such as an act of state or destruction of the subject matter of the contract."); *Command Cinema Corp. v. VCA Labs, Inc.*, 464 F. Supp. 2d 191, 198 (S.D.N.Y. 2006).

The Bankruptcy Court's finding that the B&C Fund caused Hostess's expulsion from the B&C Fund, thereby creating the impossibility that excused Hostess's performance, is a finding of fact, and thus reviewable only for clear error.  *Lowenschuss v. Kane*, 520 F.2d 255, 265-66 (2d Cir. 1975) ("Resolution of the defense of impossibility requires an examination into the conduct of the party pleading the defense in order to determine the presence or absence of such fault.  In all but the clearest cases this will involve issues of fact.").

Appellant argues, as it did below, that because Hostess created the impossibility of performance by failing to make payments to the B&C Fund, which in turn resulted in its termination from the fund, Hostess cannot benefit from a defense of impossibility.  Appellant's Br. at 15-20.  Appellant's argument ignores the fact that the B&C Fund was the intervening cause of Hostess's termination from the Fund, and indeed, Appellant acknowledges that the

13

B&C Fund partially "contributed to the present situation." Reply Br. at 7, Doc. 8. The Trust Agreement clearly provides the trustees of the B&C Fund with discretion to terminate employers, and does not require the trustees to expel delinquent employers. *See* Appellees' Br. at 7, Appendix A (Trust Agreement at Art. XII § 1). The trustees chose to exercise that discretion. *Id.* at Appendix J (Dec. 15, 2011 Termination Letter from Trustees). Accordingly, the Bankruptcy Court did not clearly err in finding that the B&C Fund caused Hostess's expulsion from the fund, and consequent inability to perform.

### iii. Feasibility of Appellant's Remedy

The Bankruptcy Court opined that it is unclear that reinstatement "could be done unilaterally over the automatic stay of Section 362 of the bankruptcy code in that such a unilateral act would, in fact, elevate … a withdrawal claim … [which would] be paid in tiny bankruptcy dollars … into a hundred cent post-petition claim." Hr'g Tr. 88:25 – 89:10. Given that the Bankruptcy Court correctly found that Hostess did not have any obligation to perform, or in the alternative, was excused from such an obligation, the Court need not address the Bankruptcy Court's findings that the remedy sought by Appellant—payment directly to employees or reinstatement of Hostess into the B&C Fund—is not necessarily feasible.[8]

The foregoing findings by the Bankruptcy Court will not be disturbed.

---

[8] The Bankruptcy Court's finding does not preclude Hostess, "in the context of either resolving the 1113 motion or in negotiating a new [CBA], [from] agree[ing] on terms that would either make the fund or the union whole or some subset of that." H'rg Tr. 89:11 – 89:18. Thus, even though administrative expense priority is unavailable to Appellant for Pension Wage Deferrals, Appellant will not necessarily be left without a remedy.

### III.     Conclusion

For the reasons set forth above, the order and judgment of the Bankruptcy Court, dated June 27, 2012, is AFFIRMED. The Clerk of the Court is respectfully directed to docket this decision and close the case.

It is SO ORDERED.

Dated:   September 27, 2013
         New York, New York

_____
Edgardo Ramos, U.S.D.J.